UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| ANDREW SIMMERMAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 5: 14-382-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| ACE BAYOU CORP., et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

*** *** *** ***

This matter is pending for consideration of the plaintiffs' motion to exclude the testimony of the defendants' expert witness Dr. James M. Miller and to strike his supplemental report. [Record Nos. 119 and 137] Dr. Miller has demonstrated that he is qualified as an expert and that some of his opinions are sufficiently reliable to meet the requirements of Rule 702 of the Federal Rules of Evidence. However, his opinions regarding parental supervision are not admissible because they will not aid the trier of fact. As a result, the plaintiffs' motion to exclude his testimony will be granted, in part, and denied, in part. The plaintiffs' motion to strike Dr. Miller's supplemental report will be denied.

**I.**

Plaintiffs Andrew Simmerman and Terri Mills were the parents of a three and one-half-year-old child (MKS) who died after becoming enclosed in a bean bag chair. [Record No. 1-1] On September 12, 2012, Simmerman was watching MKS alone while Mills was working. [Record No. 116-11, pp. 37-38; Record No. 116-12; p. 50] Simmerman states that he last saw MKS just before showering. [Record No. 116-12, p. 52] According to

Simmerman, MKS was watching television while sitting on the beanbag chair. *Id.* Sometime thereafter, Simmerman called his father. *Id.* at 55. Simmerman noticed that MKS was missing when his father asked to speak to her but she could not be found. *Id.* at 56. Simmerman searched for MKS outside before contacting Mills at work. *Id.* at 59-60. Mills returned home immediately and after unsuccessfully searching for MKS, called 911. [Record No. 116-11, pp. 41-43]

Brian McWhorter, a firefighter with the Lexington Fire Department, found MKS after noticing that the beanbag in her room was oddly shaped. [Record No. 116-23, pp. 20-21] McWhorter realized something hard was inside the beanbag and noticed that it was "entirely zipped up." *Id.* McWhorter testified that he had an "extremely hard time getting it unzipped," and could only get the bag unzipped far enough to reach his hand inside. *Id.* When he felt skin, he grabbed the bag and "ripped it open to get her out." *Id.* at 22. Attempts by McWhorter and other emergency personnel to revive MKS were unsuccessful. The autopsy report concluded that the immediate cause of MKS' death was "asphyxiation/suffocation" due to being enclosed in the bag. [Record No. 116-24, p. 1]

A.  **MKS' Beanbag Chair**

The beanbag was purchased by Terry and Patty Mills, Terri Mills' parents, on July 30, 2012, at a Wal-Mart Supercenter[1] in Lebanon, Kentucky. [Record No. 116-5, pp. 28-29; Record No. 128-1] The bag was placed in MKS' bedroom. [Record No. 116-11, p. 34] The shell of the bag was made in Mexico according to the bag's outer tags, and the parties agree

---

[1]  In this action, the plaintiffs sued Wal-Mart Stores, Inc. and Wal-Mart Stores East, L.P., collectively referred to herein as "Wal-Mart."

that Defendant Ace Bayou Corporation ("Ace Bayou") filled the bag with Styrofoam beads and sold it to Wal-Mart. [Record No. 116-7, p. 9]

The parties also agree that ASTM F1912 – 98, a regulation promulgated by ASTM International,[2] constitutes the industry standard for beanbag safety. ASTM F1912-98 distinguishes between beanbags that are intended to be refilled and beanbags that are non-refillable. [Record No. 116-9] For beanbags that are not intended to be refilled by the consumer, "[p]rior to shipment, zippers shall be closed and permanently disabled with a mechanical device." *Id.* at 1. Further, "[t]he zipper shall be closed and disabled such that a force to open the zipper of 15 lbf [pounds of force] (67N) or more shall be required to produce a direct path."[3] *Id.* For a beanbag that is intended to be refilled,

> The zipper shall always lock when closed. The use of a special tool as described in the product literature or supplied at the time of purchase shall be required to open or reopen the zipper. A force to open the zipper of 15 lbf (67 N) or more shall be required to produce a direct path unless a special tool is used.

*Id.* at 2.

The regulation does not explain how the 15 lbf test should be performed. Before shipment, a refillable beanbag's zipper must be "closed and the special tool required to open or reopen the zipper shall be removed from the zipper." *Id.*

MKS' beanbag has an inner and an outer zipper of the same length (one on top of the other). The photographs of the bag taken by the Medical Examiner show that the inner

---

[2] ASTM International is a private international standards organization that promulgates safety standards for a wide variety of consumer products.

[3] ASTM F1912 – 98 defines "direct path" as, "an opening in a bean bag chair that allows a straight, 6 in. long, 1/8-in. diameter, cylindrical rod to penetrate from outside the bag to the beads or to a liner inside the bag that holds the beads if such a liner is used." [Record No. 116-9, p. 1]

zipper has a pull tab attached to it, but the outer zipper does not have such a tab. [Record No. 116-7] Firefighter McWhorter only remembered working to unzip one zipper. He did not know whether it was the inner or outer zipper on the bag. *Id.* at 59-60. However, he did remember pulling on a zipper tab. *Id.* at 60.

According to the ASTM standard, a label must be permanently affixed to the outside of a non-refillable beanbag and contain the following warning:

> **WARNING**
> Children can suffocate in the filling inside this chair.
> Do not open this chair for any reason.
> If this chair is damaged or opened, throw away the chair and its filling immediately where children cannot get it.

*Id.*

The warning label for a refillable beanbag chair, on the other hand, should provide:

> **WARNING**
> Children can suffocate in the filling inside this chair.
> This bag should only be opened to replace the filling.
> Do not leave bag open, children can crawl inside the bag and suffocate.

*Id.*

Attached to the outside of MKS' beanbag is a warning label, which provides as follows:

> **WARNING**
> Children can suffocate in the filling inside this chair.
> Do not open this chair for any reason.
> If this chair is damaged or opened, throw away … immediately where children cannot get it.

[Record No. 116-7, p. 10]

-4-

A round "Ages 13+" sticker was affixed on top of the warning label, obscuring the words between "away" and "immediately." *Id.* The plaintiffs admit that they did not read the warning labels. [Record No. 116-11, p. 67; Record No. 116-12, p. 35, 37]

### B.     Procedural History

Ace Bayou issued a voluntary recall for the beanbag chair on August 22, 2014. [Record No. 145-2] The recall notice, published by the United States Consumer Product Safety Commission ("CPSC"), states that "a 3-year-old girl from Lexington, Ky. died" from suffocating inside the chair and inhaling the chair's foam beads. *Id.*

On September 9, 2014, the plaintiffs filed this action in Fayette Circuit Court against Ace Bayou; Richard A. Davis and Murray S. Valene, Ace Bayou's two owners; and Wal-Mart.[4] *Id.* The Complaint asserts claims of strict liability, negligence, breach of implied warranties, and outrageous conduct against all named defendants.[5] *Id.* Three of the defendants removed the case to this Court based on diversity jurisdiction. [Record No. 1]

The original Scheduling Order set the defendants' expert disclosure deadline for September 4, 2015. [Record No. 36] The Scheduling Order also required that the parties supplement their disclosures within thirty days of discovering new information. *Id.* Additionally, all supplementation of expert disclosures was due no later than thirty days prior to the close of discovery. *Id.*

---

[4]     The Complaint also named Teresa Spears as a defendant. Spears was employed as a manager at the Wal-Mart store where MKS' grandparents purchased the beanbag. The claims asserted against Spears were dismissed on November 21, 2014. [Record No. 22]

[5]     The plaintiffs also brought parental loss of consortium claims on their own behalf. Those claims were dismissed on February 5, 2016. [Record No. 180]

The Court later extended the discovery deadlines at the parties' request. [Record Nos. 76 and 77] Thus, by October 5, 2015, the defendants were required to provide their expert disclosures. [Record No. 77] And by October 15, 2015, the parties were required to complete all discovery. *Id.* The provision regarding supplementation as outlined in the original Scheduling Order remained in place. *Id.*

### C. Dr. Miller's Original Report

On October 5, 2015, the defendants timely disclosed Dr. James M. Miller as an expert witness along with his original report. [Record No. 110] Dr. Miller, an engineer, opined that MKS' beanbag chair was a "reasonably safe product both in its design and manufacture." [Record No. 116-10, p. 11] He also concluded that MKS could not have opened the outer zipper of the beanbag on her own. *Id.*

Dr. Miller based his conclusions, in part, on the anthropometric statistics that he gleaned from two published articles studying the "pinch-pull" strength of young children. *Id.* at 5. According to Dr. Miller's report, "[f]or a female child in the 2-5 year old range, the mean force is reported between 15.3 to 16.1 N (3.4 to 3.6 lbf). [MKS], at 3 ½ years of age, would have been in this age range." *Id.* (emphasis omitted) Dr. Miller observed that, with the outer pull tab removed from the uppermost zipper, that zipper was in a locked configuration. *Id.* Because the pull tab of the inner zipper was still attached, he observed that the locking mechanism within that zipper was disabled. *Id.* Dr. Miller further found that the locking mechanism of the outer zipper could be deactivated by inserting a paperclip through the opening on the zipper's head. *Id.* at 6. With a paperclip inside the outer zipper's head, Dr. Miller noted that the zipper could be opened with "minimal effort," only .6 to .8 pounds of force. *Id.* Dr. Miller also tested the outer zipper without a paperclip and with the

-6-

locking mechanism still activated. *Id.* When Dr. Miller applied five pounds of force to the outer zipper head without the paperclip, the zipper head would not move. *Id.* at 6-9. Dr. Miller stated in his report that, "[a]t no time while the subject bag was in our possession did any of us attempt to place more than 5 lbf on the locked subject zipper, since this was the decided maximum that the involved child would have been able to exert." *Id.*

>Regarding McWhorter's testimony about the zippers, Dr. Miller opined,
>
>I am reminded of Firefighter McWhorter's deposition testimony about trying to open the zipper. Since the inner zipper had the pull tab attached, it could have been opened with only a few pounds of force. Thus, one could conclude that it was the outer zipper which was actually <u>closed</u> and in the locked position and that he was unable to open. I believe his recollection that he was trying to pull on the tab was in error and that he confused it with seeing the inner zipper pull tab.
>
>Further, his testimony that he was able to open the zipper enough to feel a part of Kylee's body suggests that the inner zipper was already fully open. With the inner zipper [] closed, he would not have been able to reach through the outside zipper, through the inside zipper, and feel a body part.

*Id.* at 5.

Based on his other findings, Dr. Miller concluded that someone else must have opened the outer zipper prior to MKS' entry and that she enclosed herself in the bag by zipping the inner zipper using the pull tab. *Id.* at 5, 10.

Dr. Miller also included a section in his report entitled "XV. Parental Supervision." This section provides in part,

>First, relative to my conclusion that the outer zipper had to have been opened for [MKS] to enter the bag, what role did the parents have in not assuring that this outside zipper had been left closed, as it likely had been at [the] time of [the] purchase of the bag? The parents claim in their depositions to never have touched the bag's contents or zippers, but somehow that outside zipper was left open, in my opinion.

> Second, one has to address the reasonableness of [MKS]'s father neither observing her whereabouts or not knowing what she was doing for a period that appears to be over an hour?  This was the time of his shower (15-20 minutes) and the time he was talking to his father (40-50 minutes), both times being given in his deposition."
>
> …. Whether the subject parent was providing reasonable supervision of his 3 ½ year old daughter would seem to be a question a jury is qualified to address.

*Id.* at 11.

### D.    Plaintiffs' Motions and Dr. Miller's Supplemental Report

While the plaintiffs originally disclosed four expert witnesses, they did not submit any reports or identify any experts to rebut Dr. Miller's testimony or report. [Record No. 112-2] On October 15, 2015, the plaintiffs' deposed Dr. Miller.  Thereafter, on November 2, 2015, the plaintiffs moved to exclude his testimony.  [Record No. 119]  The plaintiffs claim that Dr. Miller is not qualified to testify as an expert under Federal Rule of Evidence 702 because: (i) his expertise is primarily in industrial safety, not consumer safety, (ii) he is not qualified to offer expert opinions regarding anthropometric data, (iii) his calculations based on anthropometric data are flawed, and (iv) he is not qualified to offer expert opinion on parental supervision and his opinions on that topic would not aid the trier of fact.  *Id.*

On November 25, 2015, the defendants responded to the plaintiffs' motion and attached a "supplemental report" by Dr. Miller. [Record Nos. 133 and 133-2]  In the supplemental report, Dr. Miller further elaborates on his qualifications and responds to the plaintiffs' critique of his anthropometric analysis. [Record No. 133-2]  Primarily, Dr. Miller explains his reasons for relying on two anthropometric studies.  *Id.*  He also lists other anthropometric studies he has reviewed and explains why those are less applicable here.  *Id.*

The plaintiff then moved to strike Miller's supplemental report under Rules 26 and 37 of the Federal Rules of Civil Procedure. [Record Nos. 137 and 137-1]

## II.

The defendants offered Dr. Miller's supplemental report as rebuttal to the plaintiffs' motion to exclude. Therefore, before addressing the motion to exclude, the Court must first determine whether the Federal Rules of Civil Procedure bar the supplemental report.

Rule 26 of the Federal Rules of Civil Procedure requires that parties disclose the identity of any expert witness they intend to use at trial. Fed. R. Civ. P. 26(a)(2)(a). Rule 26 also requires parties to supplement their expert disclosures "in a timely manner" if they learn that the original disclosure "is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). Further, parties are required to make expert disclosures "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D).

Rule 37 provides sanctions for parties who fail to comply with Rule 26(a) or 26(e). It provides that

> the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> (A)   may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
>
> (B)   may inform the jury of the party's failure; and
>
> (C)   may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c)(1).

Because the defendants filed Dr. Miller's supplemental report over two months after the deadline for expert supplements, the plaintiffs argue that Rule 37 requires the report to be stricken. [Record No. 137-1] The plaintiffs correctly observe that the Sixth Circuit has determined that the language of Rule 37(c) is mandatory. *Roberts ex. rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 782 (6th Cir. 2003). In other words, the Court *must* impose Rule 37 sanctions on a party who violates Rule 26 unless the violation is harmless or substantially justified. *Id. See also Vance v. United States,* 182 F.3d 920 (table), 1999 WL 455435, at *3 (6th Cir. June 25, 1999).

Conversely, the defendants contend that sanctions are not appropriate because they did not violate Rule 26. [Record No. 148] According to the defendants, Dr. Miller's second report does not contain "new [or] previously undisclosed" information and, therefore, is not subject to the requirements of Rule 26(e). *Id.* Instead of retaining an expert to rebut Dr. Miller's conclusions, the plaintiffs chose to critique his findings for the first time through their *Daubert* motion filed November 1, 2015, after the supplementation and discovery deadlines had passed. Thus, the defendants contend that Dr. Miller is entitled to an opportunity to rebut the plaintiffs' arguments. Further, they assert that the supplemental report only contains information Dr. Miller would have offered at a formal Daubert hearing.

When faced with similar facts, several courts have agreed with the defendants' interpretation of Rules 37 and 26. In *Fisher v. Clark Aiken Matik, Inc.*, No. 3: CV-99-1976, 2005 WL 6182824, at *1 (M.D. Pa. Sept. 26, 2005), the plaintiff's expert witness filed a supplemental report in response to the defendant's *Daubert* motion. In the response, he explained his methodology for opinions expressed in his original report. *Id.* Observing that

the report obviated the need for a *Daubert* hearing, the United States District Court for the Middle District of Pennsylvania denied the defendant's motion to strike, holding that "the rules do not require a party to satisfy *Daubert* in the required pretrial disclosures." *Id.*

In *GED Integrated Solutions, Inc. v. Durotech Int'l, Inc.*, No. 5: 06CV1327, 2009 WL 233872, at *2 (N.D. Ohio, Jan. 30, 2009), the defendant questioned an expert's ability to perform a finite element analysis. In response to the defendant's motion for summary judgment, the expert filed a supplemental report providing a detailed definition of finite element analysis, his qualifications for performing such an analysis, and the data underlying his analysis. *Id.* Like *Fisher*, the United States District Court for the Northern District of Ohio denied the defendant's motion to strike the supplemental report. *Id.* In reaching it decision, the court reasoned that "the information contained in the report is nothing more than what the Court would have learned had it held a formal hearing on this *Daubert* challenge." *Id.*

Here, Dr. Miller's supplemental report outlines his qualifications for analyzing anthropometric data and opining on consumer safety matters. [Record No. 133-2] It also explains his methodology for selecting the anthropometric statistics upon which his original report relied. *Id.* In short, the supplemental report does not contain any new theories. Instead, it simply explains Dr. Miller's methodology and attempts to rebut the arguments made by the plaintiffs in their *Daubert* motion.

While the above cases are not controlling, the plaintiffs have failed to cite any conflicting authority based on facts similar to those presented here. The plaintiffs claim that *Vance*, 1999 WL 455435, an unpublished Sixth Circuit case, is "somewhat factually similar." [Record No. 137-1] However, the facts of *Vance* are distinguishable. In *Vance*, the plaintiff

did not disclose the identity of his expert until seven days after the deadline. *Id.* at *2. And at the time of disclosure, the plaintiff failed to file the expert's formal report or his CV. *Id.* As a result, the court refused to consider a supplemental affidavit filed by the expert in response to the defendant's motion for summary judgment. *Id.* at *5.

In contrast, the defendants in this case timely identified Dr. Miller and disclosed his formal report. His supplemental report responds to the plaintiffs' critique of his qualifications and methodology that the defendants could not have anticipated during the discovery period. Therefore, the plaintiffs' motion to strike Dr. Miller's supplemental report will be denied, and the contents of that report will be considered in addressing the plaintiffs' motion to exclude his testimony.

### III.

The admission of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Rule reflects the Supreme Court's holding in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See* Fed. R. Evid. 702 advisory committee's note (2000 Amendments). In *Daubert*, the Court explained that Rule 702 is intended to provide a flexible framework for deciding whether expert testimony is sufficiently reliable

-12-

for presentation to the jury. 509 U.S. at 594. *See also United States v. Jones*, 107 F.3d 1147, 1156 (6th Cir. 1997) (finding that the trial judge still serves an important gatekeeping role after *Daubert*, requiring him to determine whether evidence is not only relevant, but also reliable.). While trial court judges serve as evidentiary gatekeepers, rejection of expert testimony is the exception rather than the rule. *See* Fed. R. Evid. 702 advisory committee's note (2000 Amendments).

## IV.

### A. Qualifications

The plaintiffs contend that Dr. Miller's education and background do not qualify him to express opinions regarding the pressure that a child is capable of exerting on a zipper. [Record No. 119-1, p. 9] In support, they argue that Dr. Miller's experience is primarily in industrial (as opposed to consumer) safety. *Id.* at 9-10. Further, they repeatedly insist that Dr. Miller is not qualified to analyze anthropometric statistics because he does not use anthropometric data in his "day-to-day work." *Id.* at 14. *See also* Record No. 144, p. 2.

Dr. Miller has a bachelor's degree in mechanical engineering, a Master Business Administration degree, and a Ph.D. in industrial engineering. [Record No. 133-1] Dr. Miller testified during his deposition that his specialty during his doctorate work was "human factors in ergonomics." [Record no. 119-3, p. 39] According to his supplemental report, Dr. Miller taught engineering classes at the University of Michigan over a twenty-five year period that included elements of "statistics, anthropometry, and strength." [Record No. 133-2, p. 1]

The statements included in Dr. Miller's supplemental report are consistent with his deposition testimony. When asked about his experience with anthropometric statistics, Dr.

-13-

Miller testified that he worked on biomechanical strength models at the University of Michigan that are now utilized by the National Institute of Occupational Safety and Health Administration ("NIOSH"). [Record No. 119-3, p. 49] At one point, he was "in charge of all the OSHA [Occupational Safety and Health Administration] standards for the country." *Id.* at 54. Further, Dr. Miller chaired and served as a committee member for several Ph.D. students who focused their dissertations on strength models. *Id.*

Regarding his consumer product safety background, Dr. Miller has worked with the Consumer Product and Safety Commission to develop consumer safety warnings and labels. *Id.* at 69. Additionally, Dr. Miller is on an ASTM committee that establishes safety standards for a variety of consumer products. *Id.* at 58. As part of his committee work, Dr. Miller consulted anthropometric data in developing safety requirements that prevent children from tipping over furniture. *Id.* at 71. When questioned about his experience testing zippers, Dr. Miller testified that pull tests are "very common" in the engineering field. [Record No. 119-3, p. 42] And while he had not specifically analyzed zippers prior to this case, he testified that he was familiar with the ratcheting mechanism that makes a locking zipper head like the ones used by Ace Bayou work. *Id.* at 139.

Dr. Miller's CV, original report, supplemental report, and deposition testimony indicate that he has sufficient education and experience to testify as an expert on human strength capabilities. Even though he did not generate the anthropometric studies upon which he relies, "[t]rained experts commonly extrapolate from existing data." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The plaintiffs are correct that "expert testimony prepared solely for the purpose of litigation, as opposed to testimony flowing naturally from an expert's line of scientific research or technical work," is generally viewed with caution by

-14-

courts conducting a *Daubert* analysis. *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007). Nevertheless, the mere fact that a proposed expert does not interface with a particular type of data or product each day does not mean that his opinion was formed "solely for the purposes of litigation." Dr. Miller has a wide array of engineering experience, and Rule 702 does not require that he work on a daily basis with zippers, anthropometric statistics, and consumer safety standards before providing expert opinions regarding MKS' ability to open the subject beanbag.

### B. Reliability of Anthropometric Calculations

The plaintiffs also argue that Dr. Miller's conclusions are unreliable because: (i) the anthropometric studies he used did not involve zippers; (ii) he did not explore the impact of different positions and grips that MKS could have used; (iii) the anthropometric studies he used involved small sample sizes and wide age ranges; (iv) the anthropometric studies he used show that some girls MKS' age could exert more than five pounds of force; (v) he did not account for MKS' height, weight, and stature; (vi) he arbitrarily included a fifty percent mark-up of force amounts; and (vii) he failed to address the fact that Ace Bayou's beanbags had previously failed to resist less than five pounds of pull pressure. [Record No. 119-1] Dr. Miller adequately defended against all of these arguments during his deposition and in his supplemental report.

For instance, while the anthropometric studies he used did not involve zippers, Dr. Miller explained that both studies involved movement "very similar" to the movement necessary to open and close zippers. [Record No. 119-3, p. 28] In one study, the researchers measured the strength a child could exert when pulling a two millimeter thick strip of cloth between his or her forefinger and thumb. *Id.* at 36. Dr. Miller testified, "I believe it was the

closest testing that we could find to replicate the potential capabilities of MKS." *Id.* In his supplemental report, Dr. Miller also explained that the studies he used involved children exerting pull force for a short burst of time, whereas MKS would have needed to exert force over a longer period of time to open a twelve to fourteen inch zipper. [Record No. 133-2, p. 3] Thus, MKS' maximum pull force might have been even lower than his estimate.

The plaintiffs also claim that Dr. Miller's calculations are unreliable because some children exerted more than five pounds of force in the studies he used. For example, some children were able to exert slightly more pull pressure when they gripped the test object with their forefinger, middle finger, and thumb ("a chuck pinch") rather than just their forefinger and thumb ("a pulp pinch"). [Record No. 119-3, pp. 85-88] However, Dr. Miller questioned whether a chuck pinch would be possible on such a small zipper head. *Id.* at 88. While he would not rule out the possibility, he did not believe it was likely. *Id.* When questioned about the children in MKS' age range that exerted more than five pounds of pull force using a pulp pinch, Dr. Miller explained that those children were outliers. He relied instead upon the statistical mean of the two studies. *Id.* at 100-02. Dr. Miller admitted during his deposition testimony that he was unaware of MKS' height and weight, which put her in the ninety-seventh percentile of children her age. *Id.* at 102. However, Dr. Miller observed that the studies he had reviewed showed no correlation between the size of a child and his or her strength. *Id.* at 103-04. He opined that there could even be a "reverse correlation: The shorter the stature, the stronger the individual. You can't say one way or another without actually testing it." *Id.* at 104. The fact that one studies' appendix shows the height and weight of its subjects does not contradict Dr. Miller's opinion.

-16-

The plaintiffs have demonstrated potential areas of cross-examination for the defendants' expert witness. However, they have not demonstrated that his methods are unreliable under Rule 702. According to the Sixth Circuit, "*Daubert* requires only scientific validity for admissibility, not scientific precision." *United States v. Bonds*, 12 F.3d 540, 558 (6th Cir. 1993). *See also Daubert*, 509 U.S. at 590 ("Of course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science."). In *Bonds*, the defendants argued that the FBI's methodology for DNA testing was unreliable under *Daubert*. 12 F.3d at 558. In support, they identified other ways of more accurately testing for DNA matches. *Id.* However, because the defendants' arguments involved "a dispute over the accuracy of the probability results," the Sixth Circuit concluded that their criticisms "go[] to the weight of the evidence, not its admissibility." *Id.* at 564. Dr. Miller relied on published studies and applied accepted principles of statistical analysis in forming opinions about MKS' capabilities. While the plaintiffs might argue at trial that other probabilities existed, Dr. Miller's testimony is not inadmissible for this reason.

After arguing that his figures are too low to be reliable, the plaintiffs then assert that Dr. Miller's fifty percent mark-up of his original estimate was arbitrary. Again, however, this criticism goes to the weight of the evidence, not its admissibility. Dr. Miller's decision to test the beanbag's zipper with a few extra pounds of force may be an issue for cross-examination but is not a reason to exclude his testimony.

Both parties have engaged in extensive discovery regarding failed safety tests of Ace Bayou beanbags before and after MKS' death. The plaintiffs further criticize Dr. Miller for his refusal to consider those test results since the zippers on some beanbags failed to

withstand less than five pounds of force. This argument ignores the scope of the opinion Dr. Miller offers in his reports. It appears that the defendants plan to offer this testimony for the purpose of demonstrating that MKS could not have opened *her* beanbag. Whether she could have opened different beanbags manufactured by Ace Bayou is irrelevant.

Finally, the plaintiffs' contend that Dr. Miller's treatment of Firefighter McWhorter's testimony is "mere speculation," which undermines the reliability of his entire opinion. [Record No. 119-1, p. 33] Evaluating an eyewitness' credibility is exclusively within the province of the trier of fact. *Moreland v. Bradshaw*, 699 F.3d 908, 920 (6th Cir. 2012). Dr. Miller is not qualified to give his opinions on the reliability of McWhorter's statements and will not be permitted to do so at trial.

However, "[e]xpert testimony is not inadmissible simply because it contradicts eyewitness testimony." *Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999). Rather, if the expert's opinion is based on the facts conveyed by the physical evidence, his testimony is admissible. *Id.* at 498. Like in *Greenwell*, the plaintiffs here have not presented facts "that plainly contradict the physical evidence upon which [Dr. Miller] based his theory of the accident." *Id.*

### C. Opinion Regarding Parental Supervision

The plaintiffs also object to the admission of Dr. Miller's opinions regarding the supervision of MKS, or lack thereof. [Record No. 119-1, p. 15] Dr. Miller is qualified to provide expert testimony regarding the sufficiency of the beanbag's labels and warnings. However, there is no evidence that he is qualified to offer expert testimony regarding issues of parental supervision or childcare. Instead, this will be an issue for the jury to resolve without assistance from Dr. Miller. The plaintiffs' motion to exclude his testimony will be

granted, but only insofar as it seeks to prevent Dr. Miller from offering opinions regarding the plaintiffs' supervision of MKS and the credibility of other witnesses.

## V.

Accordingly, it is hereby

**ORDERED** as follows:

1. The plaintiffs' motion to exclude the testimony of Dr. James M. Miller [Record No. 119] is **GRANTED**, in part, and **DENIED**, in part, for the reasons set forth above.

2. The plaintiffs' motion to strike the supplemental report of Dr. James M. Miller [Record No. 137] is **DENIED**.

This 9th day of February, 2016.

Signed By:
*Danny C. Reeves* DCR
United States District Judge